```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                       :
NAOMI PECK, MD,                                        :
                                                       :       13 Civ. 8442 (PAE)
                                    Plaintiff,         :
                                                       :       OPINION & ORDER
                    -v-                                :
                                                       :
MONTEFIORE MEDICAL CENTER,                             :
                                                       :
                                    Defendant.         :
                                                       :
------------------------------------------------------------------------X
```

PAUL A. ENGELMAYER, District Judge:

In this lawsuit, *pro se* plaintiff Dr. Naomi Peck ("Peck") applies for a preliminary injunction against defendant Montefiore Medical Center ("Montefiore"). Peck seeks to enjoin Montefiore's Department of Radiology ("Department") from going forward with its ad hoc committee process, which could eventually lead to her discharge from the Department's residency program. For the following reasons, Peck's application is denied.

## I.    Background[1]

Peck, a Native American woman, is currently employed as a third-year medical resident in the Division of Nuclear Medicine of Montefiore's Department of Radiology. Peck Aff. ¶ 1. Peck is scheduled to complete her residency program in June 2014. *Id.*

---

[1] The Court's account of the underlying facts of this case is drawn from Peck's Affidavit in Support of Application for a Preliminary Injunction ("Peck Aff.") (Dkt. 4); the Declaration of Jean Schmidt in Opposition ("Schmidt Decl.") (Dkt. 20) and attached exhibits; and the Affidavit of Andrea Tiffany Friesen in Support of Plaintiff's Reply to Opposition for Injunction ("Friesen Aff") (Dkt. 22) and attached exhibits. The Court also received, at oral argument, helpful context from the parties as to the nature and operation of Montefiore's internal processes for review of a potential termination decision. *See* Transcript of Oral Argument ("Tr.").

On November 20, 2013, Dr. Stephen Amis ("Amis"), the Chair of the Radiology Department, issued a letter entitled "Departmental Review of Proposed Adverse Action against Naomi Peck, MD."  Schmidt Decl. Ex. A ("Letter").  The letter stated that the Division Head (Dr. David Milstein), the Program Director (Dr. Anthony Abraham), and the Associate Program Director (Dr. Charito Love) in the Division of Nuclear Medicine had recommended that Peck be "removed from the Nuclear Medicine residency program at Einstein/Montefiore without delay due to substandard or otherwise unacceptable performance in several areas of your training program."  *Id.*; *see also* Tr. at 15.  The letter detailed Peck's alleged failings in the areas of patient care, practice-based learning and improvement, interpersonal and communication skills, and professionalism.  *See* Letter at 1–2.

To this letter, Amis attached the "Montefiore Medical Center Hearing and Appeal Policy and Procedures for Redress of Adverse Actions and Grievances of Residents," *see* Schmidt Decl. Ex. B ("Adverse Actions Policy" or "Policy").  In the letter, Amis noted, the Policy authorized him, "as department chair, to initiate a Departmental Ad Hoc Committee Review of this proposed action."  Letter at 1.  Amis stated that he had "elected to do so," and that he had "appointed an Ad Hoc Committee (the 'Committee') as provided by Section 3.2 of the Policy to conduct the review."  *Id.*; *see also* Adverse Actions Policy § 3.2.1 ("If the departmental chairperson determines in his or her discretion to initiate a departmental review, the chairperson shall provide the resident with a written notification of that determination, which shall include a statement of the adverse action recommended or imposed and the general reasons for it, and shall be accompanied by a copy of this policy.").

The Policy requires that the Committee be comprised of "at least three attending physicians from within the department" but "shall not include anyone who was directly involved

in the underlying matters giving rise to the adverse action or who actively participated in the determination to propose or impose the adverse action." Adverse Actions Policy § 3.2.2. In his letter, Amis noted that, consistent with the Policy, the three doctors appointed to the Committee had not been "directly involved in the underlying matters giving rise to the adverse action," nor had they "actively participated in the determination to propose or impose the adverse action." Letter at 2. The "charge to the Committee [was] to either set forth a mutually satisfactory resolution or to conclude that further efforts to bring about a resolution at the departmental level would be fruitless." *Id.* If the Committee decided the latter, then Peck would "be notified of [her] right to request a hearing under Section 4.0 of the Policy." *Id.*

> As to the steps following an ad hoc committee's review, Section 4 of the Policy states:
>
> When an adverse action has been recommended or imposed and the matter cannot be resolved at the departmental level as provided in this policy (either under circumstances where the department chairperson determined not to convene a departmental review pursuant to Section 3.2 of this policy, or a departmental review was convened but no resolution was achieved), the resident shall be entitled to a hearing. All requests for hearings shall be in writing. . . . In the case where a departmental review [under Section 3.2] took place, the hearing request must be received from the resident by the department chairperson no later than ten (10) days after receipt of the ad hoc committee report stating that no resolution was achieved. In the event the resident does not request a hearing within the time and in the manner required by this policy, the resident shall be deemed to have waived the right to a hearing and to have accepted the adverse action involved.

*Id.* § 4.1. This hearing is subject to detailed required procedures, including, *inter alia*, written notice of the reasons for the adverse action, an opportunity for the resident to rebut these reasons in writing, and a right to be represented by an attorney. *See id.* § 4.3. The burden is on the department, as the proponent of the adverse action, to "demonstrate the factual basis and reasoning which support the recommended or imposed adverse action." *Id.* All testimony is to be "taken under oath," and all "evidence (oral or written) presented to the hearing panel shall be on the record." *Id.* Further:

> Upon conclusion of the evidentiary portion of the hearing process and the receipt of written submissions (if requested by the panel), the hearing shall be officially closed. Thereafter, the hearing panel shall deliberate outside the presence of any other person except its legal counsel and, upon conclusion of its deliberations, shall make written findings and render its decision, which shall contain a statement of the reason(s) for its decision. The hearing panel shall endeavor to render its decision within twenty (20) days following the conclusion of the hearing. The decision shall take such form as the hearing panel shall determine and shall constitute the hearing panel's decision with respect to the adverse action.

*Id.* § 4.3.11. Either party has "the right to appeal the determination of the hearing panel to the president of Montefiore." *Id.* § 5.1. "The president shall make the final determination as to each finding upon which the appeal is based." *Id.* § 5.3.

In Peck's case, the Committee's review was scheduled to take place on Tuesday, November 26, 2013, *see* Letter at 2, but was rescheduled to December 5, 2013 at 9:00 a.m., *see* Peck Aff. ¶ 2. On November 26, 2013, Peck filed with this Court a Complaint ("Compl."), Dkt. 2, a request for an Order to Show Cause, Dkt. 3, an Affidavit in support of her request, Dkt. 4, and a Memorandum of Law, Dkt. 8 ("Pl. Br."). The gravamen of Peck's Complaint is that the adverse employment action initiated against her by Montefiore is motivated by "invidious and continuous discrimination based on her age, race and color." Compl. at 5; *see also* Tr. at 4 ("Q: Your argument involves the proposal to remove you from the residency program, and your allegation is that that removal is a violation of your rights under Title VII on account of your race, correct? A: Correct"). Previously, on June 24, 2013, Peck had submitted a charge of discrimination with the EEOC. *Id.* As of this writing, there is no indication that the EEOC has issued Peck a right-to-sue letter.

On December 3, 2013, the Court issued an Order to Show Cause, scheduling a hearing for 11:30 a.m. on December 5, 2013. Dkt. 11. At that hearing, counsel for Montefiore advised the Court that the Committee's review had not gone forward that morning, because Peck had not

4

appeared. *See* Tr. at 22–23. Also at the hearing, Montefiore furnished the Court with its memorandum of law in opposition to Peck's motion for a preliminary injunction, Dkt. 19 ("Def. Br.") and the Schmidt Declaration. *See* note 1, *supra*. The Court also heard argument. At the hearing's conclusion, the Court declined, at that point, to grant an injunction. *See* Tr. at 30; *id.* at 33 ("[N]othing is enjoined. Montefiore will, at its own election, go forward with its ad hoc process."). The Court, however, provided Peck an opportunity to submit a reply to Montefiore's memorandum of law by December 12, 2013. Specifically, the Court invited Peck to: (1) clarify if she was seeking to enjoin the ad hoc hearing process; (2) provide a factual basis for her claim that the fact of an ad hoc committee process, as opposed to an ultimate termination decision that may or may not come after that process, is reportable to medical licensing bodies; and (3) address Montefiore's legal argument that a termination from employment does not constitute irreparable harm. *See.* Tr. at 31–33.

On December 12, 2013, Peck submitted a Reply Memorandum of Law. Dkt. 23 ("Pl. Rep. Br. I"). Later that day, Peck sent an e-mail to the Court. Dkt. 24 ("Pl. Ltr."). On December 13, 2013, Peck submitted a second Reply Memorandum of Law, focusing on her arguments for irreparable harm. Dkt. 25 ("Pl. Rep. Br. II"). Notwithstanding that the latter two filings were submitted without the Court's permission, the Court has considered all submissions.

## II.  Discussion

Peck has clarified that she is seeking a preliminary injunction blocking the Department's ad hoc committee review from moving forward. *See* Pl. Rep. Br. I at 1 ("Plaintiff will suffer irreparable harm if the Court does not enjoin Defendant's ad hoc committee review.").

The decision to grant or deny a preliminary injunction rests in the district court's sound discretion. *See Am. Exp. Fin. Advisors Inc. v. Thorley*, 147 F.3d 229, 231 (2d Cir. 1998). But a

preliminary injunction is an extraordinary remedy that should not be granted as a routine matter. *See JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir. 1990); *Patton v. Dole*, 806 F.2d 24, 28 (2d Cir. 1986). To obtain the requested preliminary injunction, Peck must show that: (1) she would suffer an irreparable injury in the absence of an injunction, paying particular attention to whether remedies at law are inadequate compensation; (2) there is a likelihood of success on the merits, or sufficiently serious questions going to the merits and the balance of hardships tipping decidedly in plaintiff's favor; (3) the balance of hardships tips in the applicant's favor, and (4) the public interest would not be disserved by granting the injunction. *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010).

The Court considers each of these factors in turn.

### A.     Irreparable Injury

"[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) (citation omitted). Under this prong, Peck must show that "the injury [she] will suffer is likely and imminent, not remote or speculative, and that such injury is not capable of being fully remedied by money damages." *NAACP v. Town of East Haven*, 70 F.3d 219, 224 (2d Cir. 1995); *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989). Peck has failed to meet this burden for two reasons.

First, Peck's termination is not yet likely or imminent. Peck is still at least two steps removed from a possible final decision to discharge her from Montefiore's residency program. At this stage, the Department has only begun the ad hoc committee review of the Division of Nuclear Medicine's request to terminate Peck. *See* Letter at 2 (citing Adverse Actions Policy § 3.2). It is, at this stage, too early to known whether Peck will ultimately be terminated. That

would turn on whether the ad hoc committee review itself results in a mutually satisfactory outcome, and if not, assuming Peck requests the hearing to which she is entitled under § 4.1 of the Adverse Actions Policy, what the outcome of that hearing is.

Peck claims that this review process presents "a severe due process violation," Pl. Ltr., in that, before moving to ad hoc committee review, Montefiore was required to pursue some form of informal resolution within the Department that she contends has not occurred. But, beyond contemplating that the department chairperson will attempt to resolve such matters informally, efforts which the chairperson, Amis, represents have not proven successful, the Policy does not require any informal settlement process within the department. *See* Adverse Actions Policy § 3.1 ("The procedure for resolving such issues may, but need not necessarily, include a meeting(s) with the resident and/or others involved in the issues."). Nor did the process bar the Department from moving now to ad hoc committee review, as § 3.1 of the Policy expressly authorizes it to do upon the departmental chairperson's determination that the matter cannot be resolved informally. *See id.* ("In the event the matter cannot be resolved informally by the department chairperson, a departmental review pursuant to Section 3.2 of this policy may be initiated if in the discretion of the chairperson such review may be of value in reaching a resolution."). Indeed, the ad hoc committee review process itself appears to be, in effect, a form of mediation, in which independent physicians within the department attempt to achieve a resolution of the controversy.

The ad hoc proceeding, in fact, gives Peck an additional level of process beyond the formal hearing that, at her request, would ensue if the ad hoc committee review process does not bear fruit.

Further, the formal hearing procedures, on their face, appear consonant with due process. To begin with, Peck has the right to demand such a hearing: If the ad hoc committee decides that

it is unable to reach a resolution short of discharge, Peck may request a formal hearing. *See id.* § 4.1 (A "resident shall be entitled to a hearing" if "a departmental review [is] convened but no resolution [is] achieved"). At this hearing, Peck, with or without the assistance of counsel, may challenge her termination on any ground, including that her termination was, as she now alleges, motivated by racial discrimination. *Id.* § 4.3; *see* Tr. at 26 ("Court: At the hearing, presumably [Peck] would be given an opportunity to testify and would be able to relate, for example, statements of the sort that she references here to the effect that they are reflecting a racial motivation. Would her counsel have the opportunity to examine adverse witnesses? Schmidt: Yes. Court: And therefore, presumably, part of the cross-examination that would be available to her lawyer, or should she proceed pro se to her, would be to test the veracity of the witnesses against her, including on grounds of racial bias? Schmidt: Correct.").

Both Peck and Montefiore would have the right to provide oral or written evidence to the panel, but Montefiore would bear the burden of establishing a "factual basis" for Peck's termination. *Id.* These procedures are, on their face, consonant with due process. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) (employee only needs to have "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story"); *O'Conner v. Pierson,* 426 F.3d 187, 197 (2d Cir. 2005) ("Because pre-deprivation process serves a limited function, the Constitution mandates only that such process include, at a minimum, notice and the opportunity to respond."); *Locurto v. Safir,* 264 F.3d 154, 171 (2d Cir. 2001) (same). The hearing process described in Section 4 gives Peck notice and an opportunity to respond before her termination becomes final.

Peck does not argue that the procedures attendant to the formal hearing fall short of those required by due process. Instead, she contends that such a hearing process would be "nothing

more than a sham, conducted to 'rubber stamp' the recommendation of the ad hoc review committee." *See* Pl. Rep. Br. II at 1. But that allegation is conclusory. Peck has not recited any concrete basis to doubt that the procedural hearing that she has an absolute right to trigger would protect her from termination if in fact, on the evidence presented, termination was unjustified.

The Court, therefore, finds that the present ad hoc committee review process will not work irreparable harm on Peck. If this step in Montefiore's process for considering termination of a resident results in an amicable resolution, no irreparable harm, by definition, will have been done to Peck. If this step does not result in a resolution, Peck may pursue a formal hearing, at which, assisted by counsel if she wishes, she may contest, on the merits, the department's recommendation that she be terminated. The existence of the formalized hearing process, and the opportunity it would give Peck to obtain relief from the proposed termination if still pursued, defeats the claim that the present ad committee proceedings will work irreparable harm on her, let alone that such harm is "likely and imminent." *NAACP v. Town of East Haven*, 70 F.3d at 224; *see also Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (plaintiffs must demonstrate that absent a preliminary injunction they will suffer "an injury that is neither remote nor speculative, but actual and imminent").

Second, even if Montefiore ultimately were to discharge Peck—including after a formal hearing—the law is clear that a discharge from employment and the injuries that may flow therefrom (*e.g.*, lost income, damage to reputation, and difficulty finding future employment) do not constitute the irreparable harm necessary to obtain a preliminary injunction. The Supreme Court so held in *Sampson v. Murray*, 415 U.S. 61, 89–92 (1974), and numerous decisions by courts in this Circuit have similarly held, *see, e.g.*, *Savage v. Gorski*, 850 F.2d 64, 68 (2d Cir. 1988) ("Since reinstatement and money damages could make appellees whole for any loss

suffered during this period, their injury is plainly reparable and appellees have not demonstrated the type of harm entitling them to injunctive relief."); *Am. Postal Workers Union v. United States Postal Serv.*, 766 F.2d 715 (2d Cir. 1985) ("[I]rreparable harm is not shown in employee discharge cases simply by a showing of financial distress or difficulties in obtaining other employment."); *Raghavendra v. Trustees of Columbia Univ.*, No. 06 Civ. 6841 (PAC) (HBP), 2008 WL 2696226, at *13 (S.D.N.Y. Jul. 7, 2008) ("It is clear that the remedies available at law are more than adequate to compensate Plaintiff in the event that his claims are found to have merit, even if they are not as immediate as he would prefer."); *Ahmad v. Long Island Univ.*, 18 F. Supp. 2d 245, 248 (E.D.N.Y. 1998) ("[T]he termination of Dr. Ahmed's employment does not rise to the level of 'irreparable harm' required to grant" injunctive relief.). In so holding, the Court does not minimize the damage to a medical resident that could be done by wrongful termination from a residency program. Such damage could indeed be formidable. The Court's holding merely recognizes that, she would have a remedy at law, in the form of money damages, to compensate her for these injuries.

Accordingly, Peck has failed to establish the irreparable harm that is a required showing for her to obtain a preliminary injunction.

### B. Likelihood of Success on the Merits

As to the element of likelihood of success on the merits, Peck's claim is that the Department is seeking to terminate her due to racial discrimination. Under Title VII, it is unlawful for an employer to "discharge any individual . . . *because of* such individual's race, color, religion, sex, or national origin." 42 U.S.C. §§ 2000e-2(a)(1) (emphasis added). For this claim, Peck appears principally to rely on a statement allegedly made to her by Dr. Anthony Abraham ("Abraham"), the Nuclear Medicine residency program director since January 1, 2012,

10

to the effect that Peck, a Native American, should "go back to the reservation." Pl. Rep. Br. I at 7. The Department counters that its basis for pursuing discharge is that that her performance as a third-year resident has been, in various ways, substandard and unacceptable. *See* Letter at 1–2. The Department has not briefed the issue of likelihood of success on the merits, based on the short time period it had to respond to the order to show cause, and its belief that Peck could not make the threshold showing of irreparable harm.

The Court agrees that there is no need to reach this issue. In light of the determination that Peck has failed to establish irreparable harm, there is no occasion to assess whether Peck has shown a likelihood of success on the merits.

### C. Balance of Hardships

As to the third element, involving the balance of hardships, the Court concludes that this factor tips in favor of Montefiore. If the Court were to deny Peck's motion for a preliminary injunction, Peck will merely be obliged to follow the procedure that Montefiore has set for challenging a prospective termination of employment. This consists, first, of participating in the ad hoc committee process; and second, should this process not yield a resolution and should Peck seek to challenge the proposed termination, in a formal hearing with regard to that termination. Peck cannot fairly claim hardship from having to participate in this established process, which applies to all residents whose performance Montefiore might claim was sufficiently wanting to justify discharge from the residency program.

To be sure, if the facts do not justify termination, and Peck is terminated nonetheless, she will suffer substantial short-term hardship, as she will presumably be forced to bring suit to demonstrate that termination was unjustified (whether because it was racially motivated or otherwise). But, as noted, the law presumes that such injuries are compensable by money

11

damages. Although that remedy does not eliminate the inconvenience to Peck of having to challenge an adverse outcome in court, it substantially limits the cognizable hardships to her presented by allowing the current disciplinary process at Montefiore to move forward.

By contrast, if the Court were to grant the preliminary injunction, the effect of such an injunction would likely be to shut down altogether the process by which Montefiore is presently considering whether to terminate Peck. *See* Tr. at 8 ("Court: Again, your application right now is for an injunction that stops the proceeding in its tracks[?] Peck: Yes."). That is because the premise of Peck's application for preliminary relief—that she is likely to prevail on the merits of her claim of racial discrimination and that Montefiore's process for considering termination is corrupted by bias—equally applies to a formal hearing that (if requested) would follow the ad hoc committee review process. At argument, Peck, in fact, acknowledged that she is seeking to terminate the internal review process that could lead to her termination. *See id.* ("Court: In other words, what you're seeking is for the hearing to be enjoined so as to permit you to finish the program[?] Peck: Correct").

To pretermit this process would saddle Montefiore with having to retain a resident whom it claims is deficient in a variety of ways, while depriving the hospital of the opportunity to demonstrate these deficiencies. Assuming that Peck's performance is substandard and that her presence on the hospital's staff is deleterious, it is self-evident that forcing the hospital to retain her until she may complete her residency would work a hardship on the hospital. Even assuming (as the Court does) that Montefiore could safeguard patients so as to assure that Peck's alleged shortcomings would not, directly or indirectly, redound to patients' harm, a medical institution's reputation derives in part from the quality of the residents that it trains. *See id.* at 15 ("[O]nce a [resident] is graduated from the program, the hospital is basically certifying that this person is

competent and eligible to take the board certification, and Montefiore obviously takes that very seriously. They are not going to be in a position where they are certifying someone who they believe does not have the skills or capability to properly do the job."). Forcing Montefiore to graduate a resident whom it believes has failed to meet its standards would therefore cause a substantial hardship.

Accordingly, Peck has failed to establish that the balance of hardships tips in her favor.

### D.     Public Interest

The final element focuses on the public interest. Peck argues that society has an interest in preventing employers from firing employees due to racial discrimination. That is surely true. But this interest is not jeopardized by leaving in place an orderly deliberative and adjudicative process within the hospital, culminating in a formal hearing, to determine whether in fact Peck's termination results from unlawful discrimination or substandard performance. For its part, Montefiore notes that society has an interest in ensuring that the doctors trained by Montefiore are skilled enough to practice in their field after their residency, and that Montefiore's operations not be impeded by the presence of a deficient resident whom it is prevented from discharging. This interest, which is also valid, is advanced by permitting Montefiore's internal process to move forward.

The Court therefore concludes that issuing the requested injunction would disserve the public's interest. Without the injunction, Peck remains free to challenge her termination through Montefiore's established internal process. Montefiore, in turn, will be put to its proof; if at a formal hearing, it cannot substantiate its claims against Peck, it will be unable to terminate her. The public interest is well-served by the vigorous testing, through this evidentiary process, of the parties' respective contentions. And, should Peck's termination ultimately be pursued and

upheld, she will have the right, by bringing suit in court, to argue that that outcome was flawed, procedurally and/or substantively, and that she is entitled to damages. If, however, an injunction were to issue, Montefiore would effectively be required to maintain Peck's employment, even if Montefiore's allegations about Peck are true. The public does not benefit, and conceivably may be harmed, by obliging a hospital to continue to employ a resident whom Montefiore's Radiology Department has determined is substandard.

Accordingly, on balance, the public's interest is better served by denying Peck's motion for a preliminary injunction.

## CONCLUSION

For the foregoing reasons, Peck's motion for a preliminary injunction is denied. Peck's Complaint, which solely seeks such preliminary relief, is, therefore, dismissed. The dismissal is, however, without prejudice to Peck's right to bring a later lawsuit arising out of these events, including, but not limited to, a damages lawsuit challenging her termination, should such a termination ensue.[2]

The Court wishes to emphasize that its denial of Peck's motion for injunctive relief does not reflect an assessment of the merits of the parties' dispute. The Court has not been presented with evidence sufficient to enable it to make such an assessment. The Court has instead denied the application for preliminary relief on the grounds that Peck has failed to show irreparable harm or that the balance of hardships favors her. Thus, the Court does not pass judgment on the assertion by Peck's Department that her conduct merits termination, or on Peck's assertion that the Department's attempt to terminate her is the product of racial discrimination. Should the

---

[2] Any court challenge to her termination now would, of course, be premature, both because Peck has not yet been terminated from Montefiore, and because Peck has not been issued a right-to-sue letter on her EEOC charge of discrimination. *See* 29 C.F.R. § 1601.28.

parties be unable to resolve their differences, including through the ad hoc review process that the Court has declined to enjoin, the parties will have the opportunity to fairly and vigorously litigate the merits of Peck's claims in a termination hearing and, potentially, in a lawsuit.

The Court will promptly send a copy of this Opinion & Order to the e-mail address provided by Dr. Peck. However, Montefiore is also directed to serve a copy of this Opinion & Order on Dr. Peck, and to file a certificate of service on ECF.

The Clerk of Court is directed to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: December 16, 2013
       New York, New York